## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE-OPELOUSAS DIVISION

Charles Leblanc, et al.                                      Civil Action No. 04-0611

versus                                                  Judge Tucker L. Melançon

Wyeth, Inc., et al                                 Magistrate Judge C. Michael Hill

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment filed by defendant
Prescription Management Services, Inc. ("PMSI") [Rec. Doc. 38]; plaintiffs'
Opposition thereto [Rec. Doc. 48], PMSI's Supplemental Memorandum in Support
of Motion for Summary Judgment [Rec. Doc. 74]; plaintiffs' Opposition to PMSI's
Supplemental Memorandum [Rec. Doc. 81]; and PMSI's Reply Memorandum
[Rec. Doc. 88].  Numerous supplemental pleadings have been allowed and are
before the Court as follows:  PMSI's Supplemental Motion for Summary Judgment
[Rec. Doc. 101]; plaintiffs' Opposition thereto [Rec. Doc. 109]; PMSI's Reply
Memorandum [Rec. Doc. 110]; plaintiffs' further Opposition to PMSI's
Supplemental Motion for Summary Judgment [Rec. Doc. 119] and PMSI's further
Reply [Rec. Doc. 136] and plaintiffs' Sur-Reply to PMSI's Reply [Rec. Doc. 144].
For the following reasons, the motion will be granted in part and denied in part.

### I.  Procedural and Factual Background

This case arises out of Charles LeBlanc's ("LeBlanc") ingestion of the
prescription drug Amiodarone, the generic of Cordarone.  Plaintiffs Charles
LeBlanc, Brenda LeBlanc, and Jadi Gerami allege that Leblanc suffered injuries

1

and pulmonary toxicity (or lung disease) as a result of the drug.  On December 26, 2003, plaintiffs filed suit in the Sixteenth Judicial District Court, St. Mary Parish, Louisiana [Complaint, Rec. Doc. 1], naming as defendants, Wyeth, Inc. and PMSI. Defendants removed the action to this Court under diversity jurisdiction, 28 U.S.C. §1332 [Notice of Removal, Rec. Doc. 2; Consent to Removal, Rec. Doc. 12].  In their First Amended Complaint, plaintiffs named Teva Pharmaceuticals USA as a defendant [Rec. Doc. 24]; subsequently the Court dismissed Teva on December 1, 2006 pursuant to plaintiffs' voluntary motion [Rec. Docs. 97, 99].  The Court granted Wyeth, Inc.'s Motion for Summary Judgment on October 5, 2006 [Rec. Doc. 78], so PMSI remains as the sole defendant.

On June 14 and 17, 2002, LeBlanc underwent two heart surgeries performed by Dr. Vern A. Keller ("Dr. Keller") at the Medical Center of the Southwest.  After the surgery, LeBlanc began to experience potentially life-threatening cardiac arrhythmia.  On June 18, 2002, LeBlanc's treating cardiologist, Dr. Muhammad Khan ("Dr. Khan"), prescribed Cordarone/Amiodarone 800 mg/day to treat the arrhythmias [Dr. Khan Depo. at pp. 23-24].  The prescribing information approved by the Food and Drug Administration provides the following about the risk of pulmonary toxicity:

> Cordarone is intended for use only in patients with the indicated life-threatening arrhythmias because its use is accompanied by substantial toxicity.  Cordarone has several potentially fatal toxicities, the most important of which is pulmonary toxicity (hypersensitivity pneumonitis or interstitial/alveolar pneumonitis) that has resulted in clinically manifest disease at rates as high as 10 to 17% in some series of patients with ventricular arrhythmias given doses around 400 mg/day, and as abnormal diffusion capacity without symptoms in a

much higher percentage of patients.  Pulmonary toxicity has been fatal about 10% of the time.

On June 20, 2002 Dr. Khan examined Leblanc and wrote in a "progress note" to "decrease Cordarone to 400 milligrams once a day in one week. [Dr. Khan Depo., p. 33].  LeBlanc received Amiodarone HCL (Cordarone) in oral tablet form through the pharmacy at the Medical Center of Southwest Louisiana during his stay from June 17, 2002 until his discharge on June 24, 2002.  After his discharge, LeBlanc filled a prescription for Cordarone written by Dr. Keller at Baldwin Drugs.  A "Patient Transfer Request" was made on July 9, 2002, transferring this medication, among others, from Baldwin Drugs to PMSI.  The Patient Transfer Request indicates that Baldwin originally filled the prescription for Amiodarone on June 24, 2002, consisting of 120 tablets to be taken in the amount of 800 mg/day, and, at the time of transfer, three refills remained.  The transfer to PMSI was completed on July 15, 2002, and on July 18, 2002 PMSI filled the Amiodarone for the first time. [PMSI's Memorandum in Support of Motion for Summary Judgment, Rec. Doc. 38, p. 5; Exh. D].  PMSI refilled and sold the medication to LeBlanc on August 7, 2002 and August 30, 2002 in the quantity of 120 tablets per order [Id.].  When LeBlanc requested a refill on September 26, 2002, PMSI sent a FAX request to Dr. Keller [Id. at p. 6, Exh. D] which Dr. Keller approved [Id., Dr. Keller Mar. 2006, Depo., Exh. F]. The medication was refilled with 200 mg tablets, a quantity of 120 tablets, two tablets, two times a day with approval for a 90-day supply at a time (360 tablets total were dispensed as authorized for the 90-day supply) [Id. at pps. 6-7, Exh. D].  PMSI subsequently

refilled the medication for Dr. LeBlanc on October 2, 2002 and January 3, 2003, 360 tablets each [Id. at p. 7, Exh. D].

Plaintiffs allege that LeBlanc became very ill in late December, 2002, suffering from nausea, weakness and vomiting; was admitted to the hospital and diagnosed with lung disease and that LeBlanc was ordered to stop taking Cordarone in January, 2003 [Petition for Damages, Rec. Doc. 1 at V]. Plaintiffs summarize the following as disputed issues of material fact: (1) that LeBlanc's prescriptions for Amiodarone were excessive in quantity and/or duration; (2) that the prescriptions put LeBlanc at substantial risk for serious harm; and (3) that PMSI breached its duty to warn either LeBlanc or the prescribing physician that his Amiodarone prescription put him at substantial risk for serious harm. [plaintiffs' Summary of Disputed Issues of Material Fact, Rec. Doc. 48 at p. 2].

## II.  Motion For Summary Judgment Standard

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ. P. 56(c). The movant must inform the court of the basis of its motion and identify the portions of the record which reveal there are no genuine material fact issues. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In adjudicating a motion for summary judgment, the court must view all facts in the light most favorable to the non-movant." *Adams v. Travelers Indem. Co. of Conn.*, 2006 WL 2620585, 3 (5th Cir. 2006).  The function of the court, therefore, is to make the threshold inquiry of

4

determining whether there is a need for a trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the movant makes this showing, the nonmovant must demonstrate that there is evidence in the record establishing that there is a genuine issue of material fact for trial. *Celotex* at 323-24. To carry this burden, the opponent must do more than simply show some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A dispute as to a material fact is "genuine" under Rule 56(c) only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 251-52. The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to preclude a grant of summary judgment. *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir.1999). The opponent must present evidence sufficient to support a resolution of the factual issue in his favor. *Anderson*, 477 U.S. at 248-52. The court may properly enter summary judgment against a party if that party fails to establish the existence of an element essential to the case and as to which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-24. Summary judgment is also appropriate when the only issues to be decided in the case are issues of law, or when the non-moving party's claims are legally deficient. *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063, 1065 (5th Cir.1995). When the facts are disputed, the court does not determine the credibility of the evidence and draws all justifiable inferences in favor of the nonmovant. *Bledsoe v. City of Horn Lake, MS* , 449 F.3d. 650, 652-53 (5th Cir.2006).

*III.  Analysis*

*A.  Plaintiffs' Strict Liability, Strict Products Liability, Redhibition, Fraudulent Misrepresentation, and Breach of Implied and/or Express Warranties Claims*

Although plaintiffs' allegations against PMSI stem from its actions in filling LeBlanc's prescriptions rather than any alleged defect in the product, plaintiffs have included PMSI in their claims made against all defendants for strict liability, strict products liability, redhibition, fraudulent misrepresentation and breach of implied and/or express warranties in addition to their claims for the alleged negligence of PMSI [plaintiffs' Opposition to PMSI's Motion to Re-urge and Supplement Motion for Summary Judgment, Rec. Doc. 119, p. 2,  Petition for Damages, Rec. Doc. 1, XII].  PMSI moves for summary dismissal of these claims, arguing that plaintiffs' general allegations are insufficient to support their claims; and the claims are unsupported by the evidence [PMSI's Motion for Summary Judgment, Rec. Doc. 38 at p. 20].   Plaintiffs have not responded to these arguments.  Based on the evidence of record, the Court will dismiss all claims made by plaintiffs other than their claims against defendant for negligent failure to warn for the reasons that follow.

First, as to plaintiffs' product liability claims, the Louisiana Products Liability Act, La.R.S. 9:2800.51, *et seq*., provides the exclusive theories of liability for manufacturers for damage caused by their products.  *Stahl v. Novartis Pharmaceuticals Corp*., 283 F.3d 254 at 261-262 (5th Cir. 2002). In order to allege a cause of action under the Louisiana Products Liability Act (LPLA), La.R.S. 9:2800.51, *et seq*., a plaintiff must show that the defendant is a "manufacturer" as

6

defined by the LPLA.[1]  Plaintiffs have not disputed that PMSI's submission that it is neither a seller nor a manufacturer as defined by the act.  *See* Affidavit of Sharon Van Sant, Director, Claims Management for AmerisourceBergen, PMSI's parent company ("Van Sant Affidavit") [PMSI's Exhibit D, Rec. Doc. 38].[2]  Accordingly, the Court will dismiss those claims asserted by plaintiffs pursuant to the LPLA.

Second, PMSI moves for dismissal of plaintiffs' claims to the extent that these claims seek relief for any alleged defect in the Amiodarone ingested by LeBlanc and sold to him by PMSI, relying on the Van Sant Affidavit to show that

---

[1]The LPLA defines a manufacturer as follows:  (1) "Manufacturer" means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. "Manufacturing a product" means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product. "Manufacturer" also means:

(a) A person or entity who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product.

(b) A seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage.

(c) A manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer.

(d) A seller of a product of an alien manufacturer if the seller is in the business of importing or distributing the product for resale and the seller is the alter ego of the alien manufacturer. . .

LSA-R.S. 9:2800.53(1).  "Seller" under the LPLA means a person or entity who is not a manufacturer and who is in the business of conveying title to or possession of a product to another person or entity in exchange for anything of value.  LSA-R.S. 9:2800.53(2).

[2] PMSI indicates in its Statement of Material Facts that "PMSI is not a manufacturer of Cordarone/Amiodarone;" that "PMSI neither produced, made, fabricated, constructed, designed, remanufactured, reconditioned or refurbished the Amiodarone at issue;" that "PMSI did not either label the Amiodarone as its own product or otherwise held itself out to be the manufacturer of the product;" that "PMSI did not exercise control over or influence any characteristic of the design, construction or quality of the Amiodarone at issue and did not incorporate the drug into any other product a manufactured by another manufacturer;" and that "PMSI is not in the business of importing or distributing the product for resale and [that]  PMSI is not the alter ego of either Wyeth or Teva manufacturers [PMSI Statement of Uncontested Material Facts, Rec. 38].

7

PMSI did not know, and is unaware of any alleged defects or problems with the Amiodarone it sold LeBlanc. The non-manufacturer seller of a defective product is not responsible for damages in tort, absent a showing that he knew or should have known that the product sold was defective. *Spillers v. Montgomery Ward & Co., Inc.,* 294 So.2d 803 (La. 1974); *Reeves v. Great Atlantic & Pac. Tea Co., Inc.,* 370 So.2d 202, 209 (La. App. 3rd Cir. 1979); *Wilson v. State Farm Fire and Cas. Ins. Co.,* 654 So.2d 385, 387 (La. App. 3rd Cir.1995) (holding that the non-manufacturing seller of a defective product is not responsible for damages in tort absent a showing that he knew or should have known the product was defective and failed to declare it).  As plaintiffs have failed to dispute PMSI's submission, the Court will grant PMSI's motion to the extent that it requests dismissal of those claims sounding in tort to the extent that such claims seek recovery for damages due to a defect in the Amiodarone ingested by LeBlanc. Likewise, plaintiffs have not supported their claim under any strict liability theory; thus, those claims will be dismissed.

Third, the Court will dismiss plaintiffs' claims for fraudulent misrepresentation.[3]  "Under Louisiana law the elements of a claim of fraudulent misrepresentation are: "(1) a misrepresentation [or suppression] of a material fact, (2) made with the intent to deceive, and (3) causing justifiable reliance with

---

[3] "A cause of action for intentional fraudulent misrepresentation as to present or past facts exists in Louisiana. A party who is injured by fraud and deceit of another has a cause of action for damages." *Sun Drilling Products Corp. v. Rayborn*, 798 So.2d 1141, 1152 (La. App. 4th Cir. 2001) (citation omitted).  *See also America's Favorite Chicken Co. v. Cajun Enterprises, Inc.*, 130 F.3d 180, 186 (5th Cir. 1997); *Watermeier v. Mansueto*, 562 So.2d 920, 923 (La. App. 5th Cir. 1990).

resultant injury." *Calcasieu Marine Nat. Bank v. Grant*, 943 F.2d 1453, 1460 (5th Cir. 1991).   Plaintiffs have submitted no evidence to dispute the Van Sant Affidavit that PMSI had no knowledge of any alleged defects of the Amiodarone at issue nor have plaintiffs otherwise supported their claims of fraudulent misrepresentation which the Court will, accordingly, dismiss.

Fourth, PMSI moves for dismissal of plaintiffs' redhibition and implied warranty claims, arguing that plaintiffs have neither alleged nor submitted any evidence that plaintiffs tendered any allegedly defective product prior to filing its action and that plaintiffs have not alleged, nor can they allege, that PMSI had actual knowledge of any redhibitory defect  [PMSI's Memorandum in Support of Motion for Summary Judgment, Rec. Doc. 38, p. 22-3].  PMSI contends that, to the contrary, plaintiffs have alleged that the manufacturer defendants concealed the alleged risks of Amiodarone by misrepresenting its safety and dangers, failing to properly warn, and failing to provide sufficient instructions to LeBlanc or the dispensing physicians [Id. at 23].  "Redhibition is the avoidance of a sale because of some vice or defect in the thing sold. It requires the seller to return the purchase price and the buyer to return the thing purchased." *Capitol City Leasing Corp. v. Hill*,  404 So.2d 935 at 939 (La. 1981).   "A buyer may bring an action against all sellers in the chain of sales back to the primary manufacturer to rescind the sale for breach of an implied warranty."  *Pratt v. Himel Marine, Inc.*, 823 So.2d 394, 403, (La. App. 1st Cir. 2002) *citing Rey v. Cuccia*, 298 So.2d 840, 845 (La. 1974); *McNeely v. Ford Motor Company, Inc.*, 98-2139, p. 15 (La. App. 1st Cir.

12/28/99), 763 So.2d 659, 669, *writ denied*, 2000-0780 (La.4/28/00), 760 So.2d 11[82].

> In a suit for redhibition, the plaintiff must prove: 1) the seller sold the thing to him and it is either absolutely useless for its intended purpose or its use is so inconvenient or imperfect that, judged by the reasonable person standard, had he known of the defect, he would never have purchased it; 2) the thing contained a non-apparent defect at the time of sale; and 3) the seller was given an opportunity to repair the defect. *McNeely,* 98-2139 at p. 15, 763 So.2d at 669; *Vincent v. Hyundai Corporation,* 633 So.2d 240, 243 (La. App. 1st Cir.1993), *writ denied,* 93-3118 (La.2/11/94), 634 So.2d 832.

*Pratt v. Himel Marine, Inc.*, 823 So.2d 394, 403 (La. App. 1st Cir. 2002). Plaintiffs' claims against PMSI stem from PMSI's duty as pharmacist rather than from any alleged defect of the Amiodarone sold to LeBlanc.  Further, as defendant argues, plaintiff have failed to come forward with any summary judgment evidence to dispute PMSI's evidence that no tender of the product was made or otherwise shown that such notice was unnecessary due to PMSI's knowledge of the existence of an alleged redhibitory defect of the Amiodarone. The Court will therefore dismiss plaintiffs' redhibition and/or implied warranty claims asserted against PMSI.  Further, plaintiffs have not supported their claim for breach of express warranty; thus, it will likewise be dismissed.

*B.  Warning Claim*

The substance of plaintiffs' claims is that PMSI breached its legal obligations to LeBlanc as his pharmacist.   The parties do not cite nor has this Court found a Louisiana Supreme Court  addressing the duty of a pharmacist.

Although the parties disagree whether the "learned intermediary defense" is available to a pharmacist, the parties each direct the Court to the Third Circuit Court of Appeal case, *Guillory v. Dr. X*, 679 So.2d 1004, 1010 (3rd Cir.1996) an often cited case which addresses a pharmacist's duty.  In *Guillory*, the court noted:

> A pharmacist has a duty to fill a prescription correctly and to warn the patient or to notify the prescribing physician of an excessive dosage or of obvious inadequacies on the face of the prescription which create a substantial risk of harm to the patient. *Hayes v. Travelers Ins. Co.*, 609 So.2d 1084 (La. App. 2 Cir.1992), *writ denied*, 613 So.2d 975 (La.1993); *Hendricks v. Charity Hospital of New Orleans*, 519 So.2d 163 (La. App. 4 Cir.1987). "The pharmacist does not, however, have a duty to question a judgment made by the physician as to the propriety of a prescription or to warn customers of the hazardous side effects associated with a drug, either orally or by way of the  manufacturer's package insert." *Gassen*, 628 So.2d at 259, quoting *McKee v. American Home Products Corp.*, 113 Wash.2d 701, 782 P.2d 1045, 1055-56 (1989).

*Guillory v. Dr. X*, 679 So.2d 1004, 1010 (3rd Cir.1996).

The issue before the Court, one of causation, is strenuously disputed as evidenced by the number of pleadings which have been filed, and has been narrowed through supplemental pleadings, and turns on the deposition testimony of LeBlanc's three treating physicians, Drs. Keller, Khan, and Kowalski, as well as the affidavits of Drs. Keller and Kowalski submitted on behalf of PMSI. Stated simply, PMSI contends that this evidence shows that, had a PMSI pharmacist written on its refill request to Dr. Keller that the prescription refill requested appeared to be excessive in dosage, then Dr. Keller would have contacted Dr. Kowalski who was then caring for LeBlanc who would not have

11

changed LeBlanc's Amiodarone dosage downward from 400mg twice a day.[4]  A review of the Dr. Keller's affidavit shows that Dr. Keller clarified that, had PMSI written on the refill request that PMSI believed the Amiodarone prescription was excessive as written, he would have depended on the judgment and

_____

[4] Initially, PMSI moved for summary judgment, arguing that plaintiffs have submitted no evidence to suggest that the prescriptions at issue contained obvious inadequacies but than even if the Court were to determine that the Amiodarone prescriptions were excessive in dosage or duration that PMSI satisfied its limited duty by obtaining Dr. Keller's September 30, 2002 authorization [PMSI's Memorandum in Support of Motion for Summary Judgment, Rec. Doc. 38, p. 18].  PMSI submits the deposition testimony of Joseph M. Kowalksi, M.D. that Dr. Kowalski is in agreement with Dr. Khan's prescription [Id., March 15, 2006 Kowalski Depo., Exhibit E, p. 74] and the deposition testimony of Muhammad Khan, M.D. that he wrote the Amiodarone prescription on June 18, 2002 to take control over LeBlanc's arryhthmia [PMSI's Memorandum in Support of Motion for Summary Judgment, Rec. Doc. 38, p. 12, April 28, 2006 Khan Depo., Exhibit H, p. 24]; and that the benefits of the drug outweighed its risks [Id., Rec. Doc. 38, pp. 12-13; Exhibit H, pp. 27-29].  PMSI argues that Khan's testimony is that Khan would not change the prescription he issued [Id., p. 13].  PMSI also submits the deposition testimony of Dr. Keller that Dr. Keller agreed that Dr. Khan's original order for the Amiodarone "was an appropriate treatment for Mr. LeBlanc" [Id. p. 11, March 15, 2006 Keller Depo at p. 15, Exhibit F]; that Dr. Keller specifically approved the July 18, 2002, August 7, 2002, August 30, 2002 and October 2, 2002 Amiodarone prescription refills for LeBlanc because they were consistent with the orders contained in his chart [Id., Exhibit F at pps. 31-32, 44-45]; and that Dr. Keller kept the Amiodarone prescription unchanged despite his knowledge of its risks [Id., Exhibit F, p. 35].

In response, plaintiffs submitted the affidavits of pharmacist Charles Pepe and cardiologist Stephen Hubbard, M.D. to support their argument that LeBlanc's Amiodarone prescription was excessive in dosage and duration [plaintiffs' Memorandum in Opposition to PMSI's Motion for Summary Judgment, Rec. Doc. 48, Exhibits 2, 3].   Plaintiffs contend that PMSI's reliance on the testimony of Dr. Keller and Kowalski is misplaced as they have a personal stake in the outcome of this litigation as there is a medical malpractice claim lodged against them and, moreover, PMSI  mischaracterizes their testimony [Id., p. 5].  Plaintiffs argue, that, to the contrary, Dr. Keller avoided giving direct testimony, stating the prescriptions were not excessive, that Dr. Keller repeatedly stated that he deferred the arrhythmia therapy to the cardiologist; that he does not attempt to manage patients' medications following surgery because he does not see them often enough and that, although the refills were under his name, his nurses will check the cardiologist's notes and, if they do not differ from the request, will okay the request [Id., 5-6; March 15, 2006 Keller Depo., pp. 23, 24, 29, 32, 34, 50].   As to PMSI's characterization of Dr. Khan's testimony to be that Dr. Khan stated that he would not have changed the prescription, plaintiffs argue this is very misleading in that Dr. Khan actually stated in his deposition, "what we did and how we treated him in those two or three days – I have no problems in seeing that we did the right thing" [plaintiff's Memorandum in Opposition, Rec. Doc. 48, pp. 6-7, April 28, 2006 Khan Depo., Exhibit H, p. 42].  Plaintiffs rely on Dr. Khan's progress notes that the dosage should be reduced thereafter [Id., p. 7].

recommendation of the treating cardiologist [PMSI's Memorandum in Support of Motion to Re-urge Motion for Summary Judgment, Rec. Doc. 101, Affidavit of Vern Antoine Keller, M.D.]. The affidavit of Joseph M. Kowalski, M.D., indicates that he was one of Leblanc's treating cardiologists, that he continued to monitor LeBlanc's treatment, including his Amiodarone dosages, and that if PMSI had written on the request that PMSI believed the Amiodarone prescription was excessive as written, understanding the risks and benefits of the drug, he would have authorized the refill [Id., Affidavit of Joseph M.Kowalski, M.D.]. Plaintiffs respond to this testimony, arguing that, based on Keller's lack of knowledge of the drug, "it is inconceivable" that Dr. Keller would have continued the excessive dosages without contacting Dr. Khan who prescribed the drug in the first place and, had Dr. Keller done so, "he would have learned that Dr. Kahn had written the progress notes of June 20, 2002 to reduce the Cordarone (Amiodarone) to 400 mg once a day in one week [plaintiffs' Opposition to PMSI's Motion to Re-urge, Rec. Doc. 109]. As they argued in opposition to defendant's initial Motion for Summary Judgment, plaintiffs again assert that there are issues of credibility since Dr. Kowalski's actions are under review by a medical review panel and reasonable jurors could choose to disbelieve his testimony [Id.].

Referencing Dr. Kowalski's January, 2007 deposition taken for perpetuation purposes, PMSI submits the following timeline of LeBlanc's

13

treatment, emphasizing it as "critical" to the Court's understanding of the

causation issue:

1. June 17, 2002 - Surgery is performed by Dr. Keller (Leblanc's cardiovascular surgeon).

2. June 18, 2002 - Dr. Kahn (treating cardiologist of Leblanc, while he was in the hospital) ordered Amiodarone 400 mg. po b.i.d. or 800 mg. per day.

3. June 20, 2002 - A progress note of Dr. Kahn suggests a decrease of the drug to 400 mg. per day. This suggestion was not an Order.

4. June 21, 2002 - Dr. Keller reviews the progress notes of Dr. Kahn.

5. June 23, 2002 - LeBlanc is discharged from the hospital with a prescription for 800 mg. of Amiodarone daily. The discharge is signed by Dr. Lirtzman. Dr. Keller signed off on the discharge summary.

6. June 24, 2002 - Baldwin Drugs filled a prescription for 800 mg. of Amiodarone for Mr. LeBlanc.

7. July 1, 2002 - Dr. Kowalski becomes LeBlanc's post-surgery, treating cardiologist and has a first visit to assess LeBlanc's post-surgery status. The visit included a complete physical. Dr. Kowalski was to provide ongoing cardiology monitoring, including assessment of medications with an independent determination of necessary medications.

8. July 8, 2002 - Dr. Keller saw LeBlanc in follow-up to Leblanc's surgical procedure for wound care and healing examination.

9. July 9, 2002 - A Patient Transfer Request transferred the remaining refills of Leblanc's prescriptions from Baldwin Drugs to PMSI.

10. July 15, 2002 - Prescriptions were transferred to PMSI by Baldwin Drugs.

11. July 18, 2002 - PMSI filled a 30-day supply of Amiodarone (800 mg. per day) for Mr. LeBlanc.

14

[PMSI's Reply to Plaintiff's Opposition to PMSI's Motion to Re-urge, Rec. Doc. 136, pp. 2-4].  Plaintiffs on the other hand argue that the evidence shows that Dr. Khan ordered a loading dose of 400 mg of Amiodarone, twice daily for a total of 800 mg a day after a brief period of tachycardia in the hospital; that Dr. Khan advised that the Amiodarone be reduced to a maintenance dose of 400mg a day in one week, and that Mr. Leblanc return to see Dr. Khan after discharge; that Dr. Keller authorized refills for 800mg of Amiodarone a day beginning June 23, 2002 through January, 2003; that Dr. Keller testified during his January, 2007 deposition that LeBlanc's taking of Amiodarone 400mg twice a day was more than intended; that, had PMSI contacted Dr. Keller regarding the dosage, Dr. Keller would have contacted Dr. Khan; that LeBlanc never again experienced an event of tachycardia after June 17 and 18, 2002 while in the hospital and that Dr. Kowalski never wrote a prescription for Amiodarone [plaintiffs' Sur-Reply to PMSI's Reply to Plaintiff's Opposition to PMSI's Re-urged Motion for Summary Judgment, Rec. Doc. 144].

Thus, the focus of the dispute is whether, had PMSI notified Dr. Keller of any excessive dosage, which cardiologist would he have contacted for advice and whether the dosage would have been changed.  Dr. Khan and Dr. Kowalski each testified that LeBlanc was seen by Dr. Kowalski in follow-up [Khan Depo., Rec. Doc. 139, p. 39; Kowalski January, 2007 Depo., Rec. Doc. 134].  Although plaintiffs do not cite specifically to Dr. Keller's deposition, his January, 2007

deposition includes the following testimony when Dr. Keller was asked about the
July 18, 2002 refill:

> Q: All right.  But I'm asking, in this case, if you had received a call
> from PMSI advising you that they had received a prescription for an
> excessive dosage from you and you had discussed it with Dr. Kahn
> or Dr. Kowalski, you would have made a note somewhere in your
> record that you had had that discussion, would you or not?
>
> A. I don't know.
>
> Q.  If you had the chart available, would you have?
>
> A.  I would have made a note to call Dr. Kahn or would have called
> Dr. Kahn myself.

[January 9, 2007 Depo. Dr. Keller, Rec. Doc. 133, p. 97].

The parties have each submitted different versions of the relevant facts.
Moreover, the Court finds plaintiffs' argument that Dr. Kowalski's subjective
intent as to what he would have done had he been contacted by a PMSI
pharmacist regarding LeBlanc's Amiodarone dosage creates a question of fact for
the jury to be persuasive as such a determination would be based on Dr.
Kowalski's credibility as a witness.  *See Pacific Ins. Co., Ltd. v. Louisiana Auto.
Dealers Ass'n*, 2001 WL 1013089, *4 (5th Cir. 2001) (noting that cases which
turn on state of mind are rarely appropriate for summary judgment although "it
can be done" when there is no issue of material fact concerning the pertinent

intent, malice, or good faith,  *citing Guillory v. Domtar Indus. Inc. v. John Deere Co.*, 95 F.3d 1320, 1326 (5th Cir.1996). A case in such a posture as this case is not properly disposed of by summary judgment. Accordingly, defendant's Motion for Summary Judgment as to plaintiffs' claims for negligent failure to warn will be denied.

## *IV.  Conclusion*

For the foregoing reasons, the Court will grant in part and deny in part defendant's Motion for Summary Judgment [Rec. Doc. 38].  Plaintiffs' claims for damages under theories of strict liability, strict products liability, redhibition, fraudulent misrepresentation and breach of implied and/or express warranties will be dismissed and denied as to plaintiffs' negligence claims.